# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRANEL MCCOY, | : | |
| | : | |
| Petitioner, | : | |
| | : | No. 3:09CV1960 (MRK) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |

## RULING AND ORDER

Following a four-day trial in August 2006, a jury convicted Tranel McCoy on charges contained in two separate indictments. Mr. McCoy was convicted of Count One of the Superseding Indictment in the first case, No. 3:04cr336(MRK) (D. Conn. filed Dec. 14, 2004), which charged him with conspiracy to distribute five grams or more of cocaine base; and on Counts One through Three of a separate Indictment in the other case, No. 3:06cr100(MRK) (D. Conn. filed Apr. 12, 2006), charging him with possession with intent to distribute five grams or more of cocaine base, possession with intent to distribute marijuana and possession of a firearm in furtherance of a drug trafficking crime. The Court sentenced Mr. McCoy to a total effective term of 181 months' imprisonment and four years of supervised release.[1] After the Court denied his motion for acquittal, *see United States v. McCoy*, No. 3:04cr336, 3:06cr100, 2006 WL 3791390 (D. Conn. Dec. 21, 2006),

---

[1]   Before the start of trial, the Government had filed a second offender notice, under 21 U.S.C. § 851, based on Mr. McCoy's conviction for a prior narcotics felony. In addition, at sentencing, the Court imposed a one-month consecutive sentence under 18 U.S.C. § 3147, based on Mr. McCoy's commission of the offenses charged in the Indictment in the 3:06cr100 case while on pretrial release for the charge in the Superseding Indictment in the 3:04cr336 case.

Mr. McCoy appealed his conviction to the U.S. Court of Appeals for the Second Circuit, which affirmed in a summary order, *see United States v. McCoy*, No. 07-0648-cr, 07-0652-cr, 303 Fed. Appx. 45 (2d Cir. Dec. 17, 2008).

Mr. McCoy has now petitioned under 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. *See* Pet. [doc. # 1]. The Court appointed counsel for Mr. McCoy, and following briefing and a telephonic oral argument on May 14, 2010, the Court hereby denies the § 2255 petition - with one exception. The U.S. Supreme Court has granted *certiorari* in two cases that raise issues directly related to the length of Mr. McCoy's sentence. *See United States v. Abbott*, 574 F.3d 203 (3d Cir. 2009), *cert. granted*, 130 S. Ct. 1284 (Jan. 25, 2010); *United States v. Gould*, 529 F.3d 274 (5th Cir. 2008), *cert. granted*, 130 S. Ct. 1284 (Jan. 25, 2010); *see also United States v. Williams*, 558 F.3d 166 (2d Cir. 2009); *United States v. Whitley*, 529 F.3d 150 (2d Cir. 2008). The Court will await a decision from the Supreme Court in *Gould* and *Abbott*, after which Mr. McCoy may renew his § 2255 petition regarding his sentence. This opinion will address all other claims raised by Mr. McCoy.

## I.

Based on the testimony and exhibits presented at trial, the jury could have found the following facts. In March 2004, the Federal Bureau of Investigation ("FBI") began an investigation of a crack cocaine trafficking organization operating in Hartford, Connecticut. Based on wire interceptions of certain individuals involved in the organization, the FBI ultimately was led from others to Mr. McCoy. During the course of their investigation, the FBI learned that approximately 46 calls had been placed from Mr. McCoy's cellular telephone to one of the conspirator's cellular telephones. Seven of those calls occurred during the period of the wiretap and were recorded. For

2

example, on August 17, 2004, Mr. McCoy was intercepted ordering a "Q," or a quarter ounce of cocaine base, from Clayton Robinson.  Mr. McCoy said that the crack was for his "people." About two minutes later, Mr. Robinson was intercepted asking his associate, Daren Willis, if he had "two of them" for Robinson's "fat boy" on Elmer Street, which was where Mr. McCoy lived at the time. Mr. Robinson was then intercepted telling Mr. McCoy that Mr. Willis would come to see him. Approximately thirty minutes later, Mr. Robinson was intercepted talking with Mr. Willis about the transaction with Mr. McCoy and confirming that Mr. Willis had sold him "two." Other similar calls ensued.

The FBI arrested Mr. McCoy on November 10, 2004.  At the time of the arrest, he was in possession of the cellular telephone that had been intercepted during the wiretap.  When the FBI arrived at Mr. McCoy's residence, they arrested him without incident and immediately transported him to the courthouse for his presentment.  During the approximately 30-minute trip to the courthouse, and after having been advised of his *Miranda* rights, Mr. McCoy expressed a willingness to talk to the agents.  Mr. McCoy admitted that he knew certain of the individuals who had been the subject of the FBI's wiretap operation, that they sold crack cocaine, and that he purchased crack cocaine from them for the purpose of giving it to friends who wanted it.

After his arrest, Mr. McCoy was released on bond, and was ordered to reside in his apartment.  *See* Order Setting Conditions of Release, No. 3:04cr336 (D. Conn. Nov. 16, 2004). Approximately thirteen months later, the Hartford Police Department obtained a search and seizure warrant for Mr. McCoy's apartment, executing it on December 20, 2005.  Upon entering the apartment, the officers observed several adults and children. Once everyone was secured, the officers determined that approximately four adults and eight children were present.  Prior to beginning the

3

search, all of the adults were placed on a couch in the living room, and all of the children were placed in a bedroom that was found to be free of contraband. The four adults were identified as Mr. McCoy, his wife, John Ball, and Troy Young. During the routine pat down of these individuals, officers found in Mr. McCoy's front pocket a small container with several small rocks of crack cocaine, with a net weight of approximately 4.68 grams.

A search of Mr. McCoy's master bedroom revealed several items. On the night stand next to the bed, police discovered a small quantity of cash. Under the bed, however, police found a black pouch containing approximately $1700 in cash. On one of the top shelves of the entertainment center to the right of the bed, the officers found a bag containing several rocks of crack cocaine, with a net weight of 11.46 grams, a plate containing a razor blade and cocaine residue, and a bag containing several smaller bags of marijuana with a total net weight of 11.4 grams. In the drawers located at the bottom of the entertainment center, the officers found packaging material, a scale, and a .45 caliber handgun, which was stored loaded with six rounds of hollow-point ammunition and with the safety off.

At the time that the officers found the crack cocaine in the entertainment center, Mr. McCoy and his wife were sitting just outside the bedroom, on a couch in the living room. From where they were sitting, they could observe what was happening in the master bedroom. Police heard Mr. McCoy's wife become very upset when she learned that the officers had found crack cocaine in the bedroom and she began to cry. In an attempt to calm her down, Mr. McCoy stated, "Don't worry. They know it's mine. They know you had nothing to do with it." After the firearm was located, Mr. McCoy turned to Mr. Ball and told him he should take responsibility for the gun, but when asked by the police to sign a statement to that effect, Mr. Ball refused.

4

At trial, Mr. McCoy presented the testimony of two witnesses: his thirteen-year-old stepdaughter and his ten-year-old son.  The stepdaughter testified that she was in the apartment when the Hartford police executed the search warrant.  She testified that just before the police arrived, she had seen John Ball in the master bedroom looking down at the street.  At that point, she observed Mr. Ball close the sliding doors that led into the bedroom, but she said that she was still able to see in through a small opening left between the two doors.  She saw him holding a large bag of marijuana and a gun and watched as he placed the bag of marijuana on the first shelf of the entertainment center and the gun inside a night stand on the opposite side of her parents' bed from where the entertainment center was located.

Mr. McCoy's son testified that he was also in the apartment when the police executed the search warrant.  He also remembered seeing John Ball walk into the master bedroom and look out the window.  Just before the police entered the apartment, he observed Mr. Ball sneak a gun into the night stand and place a bag of marijuana on a small table on the side of the bed closest to the entertainment center.  He did not remember Mr. Ball closing the sliding doors of the bedroom and thought that they had been left open.

During its rebuttal case, the Government called John Ball as its only witness.  Mr. Ball testified that he had been inside the apartment when the police executed the search warrant, but he denied having been in possession of a firearm or a large quantity of marijuana.  Mr. Ball claimed that he had been playing a video game in the living room just before the police had entered the apartment and had never gone into the master bedroom for any reason.  When the police came inside the apartment, Mr. Ball started to run towards the kitchen and was apprehended in the process.  He admitted that he had possessed a small quantity of marijuana in his pocket, but denied having

5

possessed a firearm or a larger quantity of marijuana.

Following his conviction, Mr. McCoy filed motions for judgment of acquittal and for a new trial. Among other things, Mr. McCoy argued that there had been a violation of a Court's sequestration order and he requested an evidentiary hearing, which the Court granted. The parties did not dispute that the Court entered a sequestration order at the start of evidence in the case, which, with the exception of the Government's case agent, prevented any witness from being present in the courtroom during the trial and prevented any individual from passing on information to a potential witness regarding the testimony of another witness. Mr. McCoy asserted that the order was violated, however, when John Ball's brother, Jimmy Ball, listened to the testimony of Mr. McCoy's children and then allegedly advised John Ball of the testimony before he was called as a rebuttal witness.

The Court conducted an evidentiary hearing on the motion. At the beginning of the hearing, Mr. McCoy's trial counsel indicated that he intended to call as witnesses John and Jimmy Ball. Jimmy Ball testified first. On direct examination, he stated that he had come to court in August 2006, when his brother John had been scheduled to testify. He acknowledged that no one had explained to him what a sequestration order was or had talked to him about whether he could go into the courtroom. No one had told him that he could not discuss what he heard in court with his brother. He also acknowledged that he was in the courtroom when Mr. McCoy's children had testified and that, during their testimony, his brother had been sitting outside the courtroom on a bench with his mother. He denied, however, that he had ever discussed the substance of the children's testimony with his brother. Specifically, he said, "Because it wasn't my problem to be talking about. . . . I had nothing to do with the situation." Jimmy Ball admitted that his brother had asked him what the children had said in court, but he insisted that he had not answered John or advised him of what the

children had said.

John Ball also testified. He stated that he had been called to court to testify in August 2006 about the events that occurred inside Mr. McCoy's apartment. He also stated that when he was called to Court as a witness, he had seen two of Mr. McCoy's children, both of whom had been in the apartment during the execution of the search warrant. He admitted that his brother Jimmy Ball was also in the courthouse, and that Jimmy Ball had been in court when Mr. McCoy's children had testified, but he denied ever having asked his brother about the children's testimony, or being told about the testimony.

After both Jimmy and John Ball testified, Mr. McCoy's counsel disclosed that he had intended also to rely on the testimony of Shavoni Ledford, who was Mr. McCoy's sister-in-law and who had provided the information that had formed the basis for Mr. McCoy's motion for a new trial. Counsel indicated that he had not subpoenaed Ms. Ledford to testify because he had been under the impression that she was ready and willing to testify and, as a family member, would attend without a subpoena. He asked for a continuance so that he could subpoena Ms. Ledford to testify. The Court asked why counsel had not called Mr. Ball's mother to testify any alleged statements made by Jimmy Ball to John Ball, and counsel replied that Mr. Ball's mother had not been present when the statements allegedly were made.

The Court then reminded the parties that before testifying at trial, the Court had required John Ball to be examined outside of the presence of the jury. During that examination – which occurred on the morning of August 7, 2006, the second day of trial – John Ball asserted his Fifth Amendment right to remain silent. The Court then appointed counsel for Mr. Ball, who arrived later that afternoon. At that point, and again outside of the presence of the jury (but in Mr. Ball's presence),

7

the Court summarized for Mr. Ball's new counsel the police officers' testimony about what occurred when the search warrant was executed.  With that information, and after conferring with his client, Mr. Ball's counsel advised him that there was no risk of self-incrimination if Mr. Ball testified.  Mr. Ball then stated on the record that he would not be asserting his Fifth Amendment right to remain silent.  By witnessing these exchanges between the Court and the attorneys – all of which happened before either he or the children testified – Mr. Ball could have readily discerned that he had been accused of owning the gun in question.  In any event, Mr. Ball should have already been aware of this fact based on Mr. McCoy's earlier attempt (during the execution of the search warrant) to get Mr. Ball to claim ownership of the gun.

The Court declined to continue the post-trial hearing to allow the petitioner to call Ms. Ledyard as a witness, but permitted Mr. McCoy's counsel to proffer what her testimony would have been had she attended the hearing.  According to counsel, Ms. Ledyard would have stated that she overheard Jimmy Ball advise John Ball, while they were both in the hallway outside the courtroom, of the substance of the children's testimony.  The Court observed that any continuance in the hearing could create additional problems because it would provide Ms. Ledyard with an opportunity to tailor her testimony to that of John and Jimmy Ball.  In addition, given that John Ball's mother and his Court-appointed counsel were with him in the hallway for a great deal of the time period in question, the Court expressed some skepticism that Ms. Ledyard would have had the opportunity to overhear a conversation between Jimmy and John Ball that – as Ms. Ledyard claimed – took place when no one else was in the vicinity.  The Court also pointed out that, despite the fact that Ms. Ledyard allegedly overheard the conversation between Jimmy and John Ball on the afternoon of August 7, 2006 (the day before John Ball testified), she did not disclose it to Mr. McCoy's counsel until after

the jury had started deliberating.

Following the evidentiary hearing, the Court denied Mr. McCoy's motion for a new trial.  The Court reviewed John Ball's trial testimony and concluded that there was no evidence that he tailored his testimony based on the testimony from the children.  The Court further noted that, even assuming that defense counsel's representations regarding Ms. Ledyard's possible testimony were true, there was no reason not to believe John Ball's testimony that he had not talked to anyone about the children's testimony.  Moreover, the Court stated, "If all he knows is the kids said you put the gun and the marijuana there, which seems to me that's the most natural thing for people to say if they're going to say anything about testimony . . . that doesn't get you there, I don't think."  The Court explained that John Ball knew the police found the gun and the marijuana in the bedroom because he was sitting on the couch in the living room of the apartment when they were found.  As the Court observed, "And he didn't need anybody to tell him, if he didn't want to take responsibility for them, he ought to not be in that bedroom because that's where all the stuff was found, and he sat there on the couch while the police found all this stuff . . . . So again, to me Mr. Swaine, even if everything you say is true, I just don't think this is a situation where tailoring comes into play."  Finally, the Court pointed out that the testimony of Mr. McCoy's children was not entirely consistent.  *See* Order, No. 3:04cr336, 3:06cr100, 2006 WL 3791390 (D. Conn. Dec. 21, 2006).

## II.

To obtain collateral relief under 28 U.S.C. § 2255, the petitioner must show that his "sentence was imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255.  "As a general rule, 'relief is available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently

results in a complete miscarriage of justice.'" *United States v. Napoli*, 32 F.3d 31, 35 (2d Cir. 1994) (quoting *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989)) (internal quotation marks and citations omitted).  Constitutional errors will not be corrected through a writ of habeas corpus unless they have had a "substantial and injurious effect," that is, unless they have resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637-38 (1993); *see also Underwood v. United States*, 166 F.3d 84, 87 (2d Cir. 1999) (applying *Brecht* to § 2255 petition).

A person challenging his conviction on the basis of ineffective assistance of counsel bears the burden of proving that his counsel's representation was deficient.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. 668, 689 (1984).  In *Strickland*, the Supreme Court held that a defendant must establish: (1) that his counsel's performance "fell below an objective standard of reasonableness" and (2) that counsel's unprofessional errors actually prejudiced the defense. *Id*. at 688; *Brown v. Artuz*, 124 F.3d 73, 79-80 (2d Cir. 1997).  The *Strickland* standard is a rigorous one. *See Linstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).  "The court's central concern is not with 'grad[ing] counsel's performance,' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 696-97) (internal citations omitted).  A determination of prejudice "may be made with the benefit of hindsight." *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007).

## III.

Mr. McCoy originally filed his § 2255 petition *pro se*.  *See* Pet. [doc. # 1].  Shortly thereafter, he amended the petition and purported to abandon many of the claims from his original petition.  *See*

10

Mot. to Amend Pet. [doc. # 7].  Thereafter, the Court appointed counsel for Mr. McCoy, who has

briefed only two claims – ineffective assistance of counsel in failing to subpoena Ms. Ledford, and

the sentencing issues.  *See* Mem. in Supp. of Pet. [doc. # 12].   That said, Mr. McCoy's counsel and

the Assistant U.S. Attorney agreed that the Court should review all of Mr. McCoy's claims, even those

he purported to abandon.  Therefore, the Court construes Mr. McCoy's Motion to Amend [doc. # 7]

as supplementing, rather than replacing, his original Petition.

      **1.**    **Personal Use.**      Mr. McCoy's first claim is that his counsel was ineffective

because he failed to investigate and pursue a defense of personal use.  There is no basis to this claim.

At trial, Mr. McCoy's counsel argued that the firearm and controlled substances did not belong to Mr.

McCoy.  Pursuing a personal use defense would have been inconsistent with that primary defense.

Moreover, there was significant evidence – including the controlled substances and money found in

his apartment and intercepted phone calls in which Mr. McCoy refers to his own customers – that

would have put a lie to a defense that Mr. McCoy only obtained narcotics for his own consumption.

*See, e.g.*, *United States v. Parker*, 554 F.3d 230 (2d Cir. 2009); *United States v. Hawkins*, 547 F.3d

66 (2d Cir. 2008); *United States v. Rojas*, No. 3:06cr269 (MRK), 2008 WL 5329006 (D. Conn. Dec.

19, 2008).  Therefore, Mr. McCoy's counsel was not ineffective for failing to pursue this defense.

      **2.**    **Right to Testify.**      Mr. McCoy also claims that his counsel was ineffective because

he prevented Mr. McCoy from testifying.  There is no basis to this claim.  The Court held a lengthy

colloquy with Mr. McCoy during the second day of trial regarding his choice not to testify.  The Court

established that Mr. McCoy had weighed the pros and cons of testifying or not testifying and Mr.

McCoy responded that he had done so.  Furthermore, if defense counsel advised his client not to

testify, that advice was sensible.  Had Mr. McCoy testified, his prior criminal record would have been

admitted and he would have been asked about the telephone calls that the Government had recorded and the crack cocaine that officers found on his person in the apartment.

     **3.**     **Failure to Call Confidential Informant.**     Mr. McCoy also faults his counsel for failing to call the government's confidential informant as a witness at trial.  There is no basis to this claim.  Defense counsel did not know the identity of the informant and would not likely have been granted that information before trial.  *See, e.g.*, *United States v. Fields*, 113 F.3d 313, 314 (2d Cir. 1997); *United States v. Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986).  Moreover, the informant's dealings with Mr. McCoy were not relevant to any testimony at trial.  Had defense counsel insisted on calling the informant, the informant would have testified to several drug deals involving Mr. McCoy.  It is difficult to understand why such testimony would have helped Mr. McCoy.

     **4.**     **Failure to Investigate Alibi Defense.**     Mr. McCoy also claims his counsel was ineffective for failure to investigate an alibi defense.  Mr. McCoy does not claim that he had an alibi for either of the charges in this case.  Instead, he claims that he was not in his apartment at the time certain controlled purchases took place; those purchases were part of the basis for the search warrant that was executed on December 20, 2005.  There is also no merit to this claim.  Mr McCoy fails to explain his alibi defense.  Suffice it to say, it would not have worked.  At best, it could only have been used to attack probable cause for the search on December 20, and there was more than enough information in the search warrant affidavit to support probable cause for that search.

     **5.**     **Failure to Subpoena Ms. Ledford.**     Defense counsel was not ineffective for failing to subpoena Ms. Ledford for the evidentiary hearing on the post-verdict motions.  And even if he was ineffective – and the Court does not so find – it caused Mr. McCoy no prejudice.  Defense counsel naturally assumed that since Ms. Ledford was the sister of Mr. McCoy's wife, she would voluntarily

attend the evidentiary hearing.  That was an objectively reasonable assumption for defense counsel to make.  When she did not appear, defense counsel sought a continuance, which the Court denied after allowing defense counsel to make a proffer of what Ms. Ledford would say.  In any event, tactical decisions by defense counsel – that is, to not subpoena Ms. Ledford – do not constitute ineffective assistance of counsel if they can be considered appropriate in the circumstances.  *See, e.g.*, *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997); *Kieser v. United States*, 56 F.3d 16, 18 (2d Cir. 1995).  The decision not to subpoena Ms. Ledford was appropriate in this circumstances of this case.

Finally, there was no prejudice to Mr. McCoy.  As the Court stated, even assuming the truth of what Ms. Ledford would say if subpoenaed, her testimony did not suggest that John Ball had tailored his testimony.  Mr. McCoy argues that Mr. Ball tailored his testimony by claiming that he was not in the bedroom where the gun was found on the day in question.  According to Mr. McCoy, had Mr. Ball not been tipped off to the children's testimony about him being in the bedroom that day, Mr. Ball would not have known to deny that fact when questioned about it.   But as already discussed, John Ball, of all people, knew that the firearm was found in Mr. McCoy's bedroom; he was there when the police found it.  Moreover, Mr. Ball also knew that Mr. McCoy had said that the gun belonged to him (Mr. Ball).  Even assuming that he had been told about the children's testimony, this did not tell Mr. Ball anything that he did not already know.  Therefore, there is no possibility – let alone the "reasonable probability" that *Strickland* requires – that the outcome of the post-verdict motions would have been different had Ms. Ledford been subpoenaed and testified.  *See United States v. Romero*, 54 F.3d 56, 60 (2d Cir. 1995).

13

**IV.**

In summary, with the exception of the challenge regarding the length of Mr. McCoy's sentence, the Court DENIES his Petition [doc. # 1]. As to Mr. McCoy's sentence, the Court will take up that subject following the Supreme Court's ruling in *Gould* and *Abbott*. **The Clerk is directed to administratively close this file subject to reopening within 30 days after the Supreme Court's decision in *Gould* and *Abbott*.**

**IT IS SO ORDERED.**


/s/ _____Mark R. Kravitz_____
United States District Judge

Dated at New Haven, Connecticut: **May 19, 2010.**

14